IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEAGUE FOR COASTAL PROTECTION, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>GALE NORTON, Secretary of the Interior; UNITED STATES DEPARTMENT OF THE INTERIOR; and MINERALS MANAGEMENT SERVICE and PETER TWEEDT, Regional Manager;<br><br>    Defendants. | No. C 05-0991 CW<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS-MOTION |

Plaintiffs League for Coastal Protection, The Otter Project, Sierra Club, Citizens Planning Association of Santa Barbara County, Defenders of Wildlife, Environment California, Get Oil Out, Natural Resources Defense Council, Santa Barbara Channel Keeper, and Surfrider Foundation move for summary adjudication of their complaint against Defendants Gale Norton, the United States Department of the Interior, Minerals Management Service (MMS) and Peter Tweedt. Defendants oppose the motion and cross-move for summary judgment. The matter was heard on August 12, 2005. Having considered the parties' papers, the evidence cited therein and oral argument on the motions, the Court GRANTS Plaintiffs' motion for

summary judgment and DENIES Defendants' cross-motion.

BACKGROUND

Oil and gas leases on the Outer Continental Shelf (OSC) are governed by the Outer Continental Shelf Lands Act (OCSLA).  Under OCSLA, the Department of the Interior may issue and administer leases for exploration for and production of oil and gas on the OCS.  These leases may have a primary term of five to ten years, and may continue after the primary term for as long as there is production of oil or gas in paying quantities, approved drilling or well-reworking operations.  The MMS has the authority to grant suspensions of the primary lease term upon request of the lessee for reasons such as facilitating the development of the lease or making arrangements for transportation facilities.  A suspension of a lease suspends the running of its term; thus, a lease suspension functions as an extension of the primary lease term.

In November, 1999, MMS granted suspensions for thirty-six oil and gas leases located off of the central California coast.  These leases were originally sold between 1968 and 1984.  In granting the lease suspensions, MMS did not conduct environmental analyses or engage in consistency review processes with the California Coastal Commission.  This Court deemed those suspensions invalid because MMS had failed to comply with the Coastal Zone Management Act and the National Environmental Policy Act (NEPA).  <u>California ex rel. California Coastal Comm'n v. Norton</u>, 150 F. Supp. 2d 1046 (N.D. Cal. 2001), <u>aff'd</u>, 311 F.3d 1162 (9th Cir. 2002).

On February 11, 2005, MMS issued six final Environmental Assessments (EAs) on new proposed suspensions for the thirty-six

leases involved in the prior litigation and an adjacent lease. None of the EAs considered the potential environmental impact of post-suspension exploration and development activities. Also on February 11, MMS issued a finding of no significant impact (FONSI) on these thirty-seven proposed suspensions. MMS did not prepare an environmental impact statement (EIS) for any of the proposed lease suspensions.

The stated purpose of the suspensions is to prevent the leases from expiring and "to facilitate proper development" of the leases. Future exploration and development activities under the thirty-seven leases could not occur absent the granting of the proposed suspensions.

MMS plans to allow acoustic surveys under several of the leases during the suspension period, including several in the Santa Barbara Channel. The surveys are designed to produce information to assist in planning and implementing future exploratory drilling under the leases. The surveys would involve the regular underwater firing of an air gun producing sound at 218 decibels. Sound levels exceeding 160 decibels may be harmful to some marine life, including marine mammals and sea turtles. The EAs prepared by MMS concluded that decibel levels would exceed 160 only within a one-half mile radius of the air gun, known as the "impact zone." MMS declared in its EAs that it would institute as a mitigation measure shipboard human observers who would visually scan the impact zone for, among other things, marine mammals and sea turtles. If such a creature was seen entering the impact zone, the observer could direct MMS to turn the air gun off. MMS used a "spherical

3

spreading model" to calculate the size of the impact zone. However, the EAs did not disclose that research from several MMS scientists suggested that the model was not accurate for the Santa Barbara Channel because the water there is too shallow, and that the impact zone in the channel is potentially much larger than disclosed in the EAs. Nevertheless, MMS also relied upon field data, including a report from Exxon, to conclude that the model had accurately calculated the size of the impact zone in the Channel.

On March 9, 2005, Plaintiffs filed their complaint, which alleges that Defendants violated NEPA and the Administrative Procedures Act (APA) by failing to conduct adequate environmental analyses on the thirty-seven proposed lease suspensions at issue. Plaintiffs seek declaratory judgment that Defendants violated NEPA, and request that the Court remand the EAs and FONSIs to MMS with instructions to complete adequate NEPA environmental analyses of the proposed suspensions.

                          LEGAL STANDARD
I.   Summary Judgment

Summary judgment is properly granted when no genuine and disputed issues of material fact remain and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. See Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Insurance Co. of North America, 815 F.2d 1285, 1288-89 (9th Cir. 1987).

A motion for summary judgment may properly be brought in litigation challenging decisions and actions of federal agencies

4

1  under the APA.  See Muckleshoot Indian Tribe v. U.S. Forest
2  Service, 177 F.3d 800 (9th Cir. 1999); see also 5 U.S.C.
3  §§ 702-706.  In deciding such a motion for summary judgment, the
4  Court reviews the record of the federal agency and determines
5  whether the agency's decision was based on a consideration of the
6  relevant factors or whether its actions were arbitrary, capricious,
7  an abuse of discretion or otherwise not in accordance with the law.
8  See Blue Mountain Biodiversity Project v. Blackwood, 161 F.3d 1208
9  (9th Cir. 1998).  However, questions of law are reviewed de novo by
10 the Court.  See Wagner v. National Transp. Safety Bd., 86 F.3d 928,
11 930 (9th Cir. 1996).

12 II.  Administrative Procedures Act

13     Challenges to final agency actions taken pursuant to NEPA are
14 subject to the review provisions of the APA.  Southwest Center for
15 Biological Diversity v. Bureau of Reclamation, 143 F.3d 515, 522
16 (9th Cir. 1998).  MMS's decision not to prepare an EIS is a final
17 agency action subject to review pursuant to the APA.  Under the
18 APA, agency decisions may be set aside only if "arbitrary,
19 capricious, an abuse of discretion, or otherwise not in accordance
20 with law."  5 U.S.C. § 706(2)(A); Ariz. Cattle Growers' Ass'n v.
21 U.S. Fish & Wildlife Serv., 273 F.3d 1229, 1236 (9th Cir. 2001).

22     To determine whether an agency action was arbitrary and
23 capricious, the court must "determine whether the agency
24 articulated a rational connection between the facts found and the
25 choice made."  Ariz. Cattle Growers' Ass'n, 273 F.3d at 1236.  As
26 long as the agency decision was based on a consideration of
27 relevant factors and there is no clear error of judgment, the

5

1 reviewing court may not overturn the agency's action. Id. (citing
2 Am. Hosp. Ass'n v. NLRB, 499 U.S. 606 (1991)). In particular, the
3 reviewing court must defer to the agency's decision when the
4 resolution of the dispute involves issues of fact or requires a
5 high level of technical expertise. Marsh v. Or. Natural Res.
6 Council, 490 U.S. 360, 377 (1989); Cen. Ariz. Water Conservation
7 Dist. v. EPA, 990 F.2d 1531, 1539-40 (9th Cir. 1993). Accordingly,
8 the court may set aside only those conclusions that do not have a
9 basis in fact, not those with which it merely disagrees. Ariz.
10 Cattle Growers' Ass'n, 273 F.3d at 1236.

## DISCUSSION

### I. Future Exploration and Production Activities

Plaintiffs argue that Defendants violated NEPA by failing to prepare environmental analyses of future exploration and development activities under the leases. NEPA, Title 42 U.S.C. section 4331, et seq., requires federal agencies to consider the environmental consequences of their actions. Metcalf v. Daley, 214 F.3d 1135, 1141 (9th Cir. 2000) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348 (1989)). NEPA provides that federal agencies are to identify and develop methods for implementing NEPA in consultation with the Council on Environmental Quality. See 42 U.S.C. § 4332(B); see also, 40 C.F.R. § 1500 et seq. Title 40 C.F.R. section 1500 et seq., enacted pursuant to NEPA, are the "action-forcing provisions to make sure that the federal agencies act according to the Act." 40 C.F.R. § 1500.1(a).

NEPA requires federal agencies to prepare an EIS for any action that will significantly affect the environment. See 42

6

1  U.S.C. § 4332(C).  In determining whether an action will
2  significantly affect the environment, some factors that should be
3  considered are "(1) the degree to which the proposed action affects
4  public health or safety, (2) the degree to which the effects will
5  be highly controversial, (3) whether the action establishes a
6  precedent for further action with significant effects, and
7  (4) whether the action is related to other action which has
8  individually insignificant, but cumulatively significant impacts."
9  Alaska Ctr for the Env't v. U.S. Forest Service, 189 F.3d 851, 859
10 (9th Cir. 1999); see also 40 C.F.R. § 1508.27(b).
11     Under Title 40 C.F.R. section 1508.9, when determining whether
12 to prepare an EIS, a federal agency may prepare an EA in order to
13 "provide sufficient evidence and analysis for determining whether
14 to prepare an environmental impact statement (EIS) or finding of no
15 significant impact."  Pursuant to Title 40 C.F.R. section 1508.13,
16 if the agency finds that the proposed action would have no
17 significant impact on the environment, the agency may issue a
18 FONSI, which eliminates the agency's requirement to prepare an EIS.
19     Here, it is not disputed that the EAs prepared for the lease
20 suspensions addressed only the potential environmental impact of
21 activities planned during the lease suspensions, and did not
22 address the environmental impact of future exploration and
23 development activities under the leases.  NEPA requires federal
24 agencies to consider not just the "direct effects" of an action,
25 but also the "indirect effects, which are caused by the action and
26 are later in time or farther removed in distance, but are still
27 reasonably foreseeable."  40 C.F.R. § 1508.8.  The Supreme Court
28

7

has ruled that this test is analogous to a "reasonably close causal relationship" test. Dep't of Transp. v. Public Citizen, 541 U.S. 752, 767 (2004).

Plaintiffs argue that future exploration and development activities are reasonably foreseeable as a result of MMS's proposed lease suspensions, and that there is a reasonably close causal relationship between the suspensions and future oil and gas production. Plaintiffs note that the stated purpose of the suspensions is to facilitate future development of the leases, and that activities undertaken during the suspension are aimed at providing information for exploratory drilling. Plaintiffs cite one operations plan pursuant to which the lessee intends to "spud a delineation well" on the very date that the suspension for that lease expires. Pl.'s Mot., Ex. C.

In further support of their argument, Plaintiffs cite Village of False Pass v. Clark, 733 F.2d 605 (9th Cir. 1984), and Thomas v. Peterson, 753 F.2d 754 (9th Cir. 1985). In False Pass, the Ninth Circuit ruled that the Secretary of the Interior had not abused his discretion when he decided to consider a less serious oil-spill scenario instead of a much worse hypothetical scenario in conducting environmental analysis for an oil exploration and production lease. 733 F.2d at 616-17. However, the court held as follows: "The lease sale itself does not directly mandate further activity that would raise an oil spill problem, but it does require an overview of those future possibilities." Id. at 616 (internal citations omitted). The Ninth Circuit has analogized the lease suspensions in this case to a lease sale. California v. Norton,

8

311 F.3d at 1174.

In <u>Thomas</u>, the plaintiffs challenged an EA and FONSI prepared by the United States Forest Service for its approval of a timber road that was planned in a national forest. 753 F.2d at 756-57. The Ninth Circuit ruled that the EA was insufficient because it considered only the potential environmental impact of the road, and did not consider the impact of potential timber sales that would result; the court held that the building of the road and the sale of the timber were "inextricably intertwined," and thus connected actions, and would likely have cumulative environmental effects. <u>Id.</u> at 758-59.

Defendants argue that MMS was not required to consider the environmental impact of future exploration and development in issuing the EAs on the proposed lease suspensions. First, Defendants contend that the lease suspensions themselves cause only further planning and review of already-established development plans, rather than future development. Defendants note that MMS prepared an EIS in connection with the original lease sales and that further EISs would be required for future exploration and development plans. They argue that the suspensions do not necessarily implicate further activity that would have any environmental impact, and that the lease suspensions merely maintain the status quo. Second, Defendants argue that Plaintiffs' reliance upon <u>Thomas</u> is misplaced because, in that case, the timber road and timber sales proposals were finalized, whereas in this case Plaintiffs are arguing that the lease suspensions are connected to and have cumulative effect with potential exploration

9

1 and development activity for which there is no proposal or plan.

2 However, even if Thomas is distinguishable, Defendants have
3 not disputed that future exploration and development activity under
4 the leases at issue here is reasonably foreseeable as a result of
5 the proposed suspensions.  And, as Plaintiffs note, the lease
6 suspensions do not preserve the status quo because, without them,
7 the leases would expire.  Plaintiffs cite California v. Norton, in
8 which the Ninth Circuit not only analogized the lease suspensions
9 at issue here with lease sales, but also held that the suspensions
10 "represent a significant decision to extend the life of oil
11 exploration and production off of California's coast, with all of
12 the far reaching effect and perils that go along with offshore oil
13 production."  311 F.3d at 1173.  Defendants' argument that EISs are
14 not required because they would be required in the future for
15 exploration and development plans is similarly unavailing.  The
16 Ninth Circuit has ruled that "NEPA is not designed to postpone
17 analysis of an environmental consequence to the last possible
18 moment.  Rather, it is designed to require such analysis as soon as
19 it can reasonably be done."  Kern v. U.S. Bureau of Land Mgmt., 284
20 F.3d 1062, 1072 (9th Cir. 2002).

21 Future exploration and development activity on the thirty-
22 seven leases at issue here is not only reasonably foreseeable, it
23 is, as Defendants acknowledge, itself the object of the lease
24 suspensions.  A lessee has already made explicit plans to drill
25 under at least one lease the very day that the corresponding
26 proposed suspension expires.  MMS may not restrict its NEPA
27 analysis to activity during the lease suspensions; the agency must

28

10

consider the environmental impact of future exploration and development activity in preparing environmental analyses in conjunction with the thirty-seven suspensions in this case.  Such analyses must be prepared even if MMS does not currently have detailed proposals for such activity on all leases: "The purpose of an EIS is to evaluate the possibilities in light of current <u>and contemplated</u> plans and to produce an informed estimate of the environmental consequences. . . . Drafting an EIS necessarily involves some degree of forecasting." <u>Id.</u> at 1072 (internal citations omitted) (emphasis in original).

II.  Activities During Lease Suspensions

Plaintiffs argue that, even in its NEPA analysis of activity during the lease suspensions, MMS violated NEPA by issuing flawed and incomplete EAs.

Plaintiffs contend that MMS used an inaccurate underwater noise model in calculating the impact zone for the acoustic surveys on several of the leases and, as a result, drastically under-estimated the zone's size.  Plaintiffs argue that the spherical spreading noise model implemented by MMS was inaccurate for the Santa Barbara Channel because the water in the channel is too shallow for that model.  Plaintiffs cite internal MMS documents indicating that MMS administrators knew that the agency was using a faulty model and that the impact zone was actually much larger than it represented in the EAs.  Pl.'s Mot., Ex. J.  Plaintiffs cite <u>The Lands Council v. Powell</u>, 395 F.3d 1019, 1032 (9th Cir. 2005), in which the Ninth Circuit ruled that the United States Forest Service had violated NEPA by failing to disclose in an EIS the limitations

11

of the model it had used to determine the environmental impact of a timber sale.

Defendants argue that the methods implemented by MMS were adequate to support the agency's FONSI, and that its field data indicated that the spherical spreading model had accurately calculated the impact zone. Notably, however, Defendants do not dispute that MMS's own research indicated that the spherical spreading model has limitations when applied to shallow water, or that its mitigation measures would be inadequate if the impact zone was much larger than described in the EAs. Defendants argue that the EAs stated that field data supported the conclusions reached by MMS's use of the model. However, the sentence in the EAs upon which they rely for this argument is conclusory and insufficient. Thus, MMS violated NEPA by failing to disclose in the EAs the limitations of the spherical spreading model relied upon for the FONSI, see Lands Council, 395 F.3d at 1032, and failing to describe fully the field data supporting its conclusions irrespective of the accuracy of the model.

CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment (Docket No. 9) is GRANTED and Defendants' cross-motion (Docket No. 20) is DENIED. Defendants' motion for leave to file a reply brief (Docket No. 28) is GRANTED. The EAs and FONSIs relating to the lease suspensions at issue in this case are remanded to MMS; the agency shall complete adequate NEPA analyses on these suspensions in conformance with this order. The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

Dated: 8/31/05

CLAUDIA WILKEN
United States District Judge

13